1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10  FRANK BENSON,

11          Petitioner,                    No. CIV-S-05-2022 GEB KJM P

12      vs.

13  EDWARD ALAMEIDA,

14          Respondent.              FINDINGS AND RECOMMENDATIONS

15  _____/

16          Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17  habeas corpus, challenging a 2002 denial of parole.  He argues that the denial of parole was not

18  supported by the necessary evidentiary support, that the repeated denial of parole he has suffered

19  and the state's no parole policy violates his plea agreement, and the Superior Court's denial of

20  his habeas petition was improper.  Respondent counters that petitioner has no liberty interest in

21  parole, but that even if he does the 2002 denial was properly supported and the challenge to his

22  plea agreement is not timely and without merit.

23  /////

24  /////

25  /////

26  ////

1

I.  Background

      On December 28, 1983, petitioner was sentenced to a term of fifteen years to life following his plea of nolo contendre to second degree murder.  Answer, Ex. 1.  He was received in the Department of Corrections on February 1, 1984, and his minimum eligible parole date was calculated to be June 2, 1990.  Id., Ex. 2 at 4.

      On May 16, 2002, he appeared before the Board of Prison Terms for his parole suitability hearing.  The Board ruled that petitioner was not suitable for parole because the offense was carried out in a cruel way, demonstrating a callous disregard for suffering; the motive for the crime was inexplicable and trivial in relation to the offense; petitioner has a history of unstable and tumultuous relationships, especially with the victim; he has programmed in a limited way; he has a minor prior record; he does not have realistic parole plans because he did not provide information about a confirmed residence or verification of his union membership; his counselor believed he would pose a moderate threat if released; he was argumentative with the panel when asked about documentary support for his parole plans; and the Fremont police department opposed parole.  While the panel mentioned petitioner's minor institutional record, it is not clear whether it relied on this to deny parole.  The panel did recognize that petitioner has a positive psychological report; that he has marketable skills as a tool and die maker; that he has participated in AA; and that he has received positive work reports; and that he has been a tutor in the inmate literacy program.  Id., Ex. 2 at 45-47.

/////
/////
/////
/////
/////
/////
/////

1    Petitioner sought relief in the California courts.  Only the Alameda County

2  Superior Court issued a reasoned opinion:

3  The Petition fails to state a prima facie case for relief.  Petitioner
   fails to demonstrate exhaustion of administrative remedies.
4  However, assuming administrative remedies have been exhaused
   [sic], or as Petitioner asserts, such remedies are useless and unduly
5  delayed, a review of the transcript of Petitioner's parole hearing of
   May 12, 2002, indicated that in denying Petitioner parole, there
6  was no abuse of discretion by the parole board, nor was there a
   denial of Petitioner's constitutional or statutory rights.  The
7  transcript of Petitioner's parole hearing contains some evidence or
   basis for the denial of Petitioner's parole, including but not limited
8  to, the nature of the offense, Petitioner's inability to satisfy the
   parole board's verification requirement for Petitioner's claims
9  regarding residency after release, family and community support
   and employment, and the parole board assessment of petitioner and
10 his adjustment and potential for future dangerousness.

11 Id., Ex. 15.[1]

12 II.  Standard For Habeas Corpus Relief

13    An application for a writ of habeas corpus by a person in custody under a

14 judgment of a state court can be granted only for violations of the Constitution or laws of the

15 United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any

16 claim decided on the merits in state court proceedings unless the state court's adjudication of the

17 claim:

18 (1) resulted in a decision that was contrary to, or involved an
   unreasonable application of, clearly established federal law, as
19 determined by the Supreme Court of the United States; or

20 /////

21 /////

22 /////

23

24    [1]  In his petitions filed in the Court of Appeal and the Supreme Court, petitioner attached
   materials showing that he had exhausted administrative remedies.  See, e.g., Answer, Ex. 16.
25 Respondent does not rely on this purported failure as a procedural bar and has conceded that this
   court is not prevented from reaching the merits by any procedural bar.  Id. ¶ 20.  The court deems
26 this matter waived.  Cone v. Bell, __ U.S. __, 129 S.Ct. 1769, 1791 n.6 (2009).

3

1         (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
2  State court proceeding.

3  28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[2]  It is the habeas

4  petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See

5  Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

6         The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

7  different.  As the Supreme Court has explained:

8         A federal habeas court may issue the writ under the "contrary to"
clause if the state court applies a rule different from the governing
9  law set forth in our cases, or if it decides a case differently than we
have done on a set of materially indistinguishable facts.  The court
10  may grant relief under the "unreasonable application" clause if the
state court correctly identifies the governing legal principle from
11  our decisions but unreasonably applies it to the facts of the
particular case.  The focus of the latter inquiry is on whether the
12  state court's application of clearly established federal law is
objectively unreasonable, and we stressed in Williams [v. Taylor,
13  529 U.S. 362 (2000)] that an unreasonable application is different
from an incorrect one.

14

15  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

16  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

17  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

18  (2002).

19         The court will look to the last reasoned state court decision in determining

20  whether the law applied to a particular claim by the state courts was contrary to the law set forth

21  in the cases of the United States Supreme Court or whether an unreasonable application of such

22  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court fails

23  to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional

24  or federal law, the Ninth Circuit has held that this court must perform an independent review of

25

26      [2]  Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not
grounds for entitlement to habeas relief.  Fry v. Pliler, 127 S. Ct. 2321, 2326-27 (2007).

4

1   the record to ascertain whether the state court decision was objectively unreasonable.  Himes v.

2   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other words, the court assumes the state court

3   applied the correct law, and analyzes whether the decision of the state court was based on an

4   objectively unreasonable application of that law.

5          It is appropriate to look to lower federal court decisions to determine what law has

6   been "clearly established" by the Supreme Court and the reasonableness of a particular

7   application of that law.  "Clearly established" federal law is that determined by the Supreme

8   Court.  Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is

9   appropriate to look to lower federal court decisions as persuasive authority in determining what

10  law has been "clearly established" and the reasonableness of a particular application of that law.

11  Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th

12  Cir. 2003), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo,

13  365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of

14  Supreme Court precedent is misplaced).

15  III.  Parole And AEDPA Review

16         In Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7, 11 (1979), the United

17  States Supreme Court found that an inmate has "no constitutional or inherent right" to parole,

18  even when a state establishes a system of conditional release from confinement.  The Court

19  recognized, however, that the structure of parole statutes might give rise to a liberty interest in

20  parole that would, in turn, mean an inmate was entitled to certain procedural protections.  Id. at

21  14-15.  In Greenholtz, the Court found that the "mandatory language and the structure of the

22  Nebraska statute at issue" created such a liberty interest.  Board of Pardons v. Allen (Allen), 482

23  U.S. 369, 371 (1987).

24         In Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (en banc), the Ninth Circuit

25  sitting en banc used the Greenholtz-Allen framework as a starting place for its consideration of

26  the "limits there are on the denial of parole" and "what if anything the federal Constitution

5

1   requires as a condition of the denial of parole." Hayward, 603 F.3d at 552.  The court concluded

2   that "in the absence of state law establishing otherwise, there is no federal constitutional

3   requirement that parole be granted in the absence of 'some evidence' of future dangerousness or

4   anything else."  Id. at 561.  Again, relying on the Greenholtz-Allen framework, the court turned

5   to California statutory, regulatory and decisional law and concluded that a California inmate has

6   a state created liberty interest "to parole in the absence of 'some evidence' of future

7   dangerousness."  Id. at 562.  It reiterated that "the right in California to parole in the absence of

8   some evidence of one's future dangerousness arises from California law," and provided the

9   following direction:

10          [C]ourts in this circuit facing the same issue in the future need only
            decide whether the California judicial decision approving the
11          governor's decision rejecting parole was an "unreasonable
            application" of the California "some evidence" requirement, or was
12          "based on an unreasonable determination of the facts in light of the
            evidence."
13

14   Id. at 562-63 (footnotes omitted).

15          Following Hayward, in Pearson v. Muntz, 606 F.3d 606 (9th Cir. 2010), the court

16   described the analysis a district court must undertake:

17          Hayward specifically commands federal courts to examine the
            reasonableness of the state court's application of the California
18          "some evidence" requirement, as well as the reasonableness of the
            state court's determination of the facts in light of the evidence.
19          That command can only be read as requiring an examination of
            how the state court applied the requirement.
20

21   Id. at 609 (citations omitted; emphases in original).  Satisfaction of the "some evidence" standard

22   for purposes of denying parole in California requires "'some evidence' of future dangerousness."

23   Hayward, 603 F.3d at 562; see also Hatcher v. Carey, 2010 WL 3258578, at *1 (9th Cir. 2010);

24   cf. Pearson 606 F.3d at 608 (some evidence standard evaluates whether inmate "currently poses a

25   threat to public safety"); see also Rodriguez v. Sisto, 2010 WL 3431800, at *3 (E.D. Cal. 2010)

26   (referencing Pearson's articulation of a "current threat" to public safety).

6

1    Accordingly, in applying AEDPA following <u>Hayward</u>, the court reviews the state

2 court's decision on a parole habeas petition to determine whether its application of the some

3 evidence standard was arbitrary or was based on speculative findings and whether it was based

4 on unreasonable determinations of fact.

5 IV.  <u>Violation of Petitioner's Plea Agreement</u>

6    Petitioner argues that the Board of Prison Terms follows a "no parole" policy

7 advanced by former and current governors and that adherence to this policy violates his plea

8 bargain.  Pet., P. & A. at 5.  He contends that he pleaded guilty to second degree murder on the

9 understanding that he would serve the minimum term of ten years and that, if he made substantial

10 efforts toward reforming himself, he would be paroled.  <u>Id</u>.  He does not provide a copy of a plea

11 agreement or a transcript of his plea to substantiate his claim that some sort of promised parole

12 date was part of his plea agreement, nor does he provide any proof of the purported "no parole"

13 policy allegedly at work in his case.  His conclusory allegations do not support his claim for

14 habeas relief.  <u>Jones v. Gomez</u>, 66 F.3d 199, 205 (9th Cir. 1995).

15 V.  <u>The Denial Of Parole</u>

16    Under California Penal Code section 3041(b):

17    The panel or board shall set a release date unless it determines that
      the gravity of the current convicted offense or offenses, or the
18    timing and gravity of current or past convicted offense or offenses,
      is such that consideration of the public safety requires a more
19    lengthy period of incarceration for this individual, and that a parole
      date, therefore, cannot be fixed at this meeting.
20

21    As noted, the paramount concern in determining parole suitability in California is

22 public safety.  <u>Hayward</u>, 603 F.3d at 562; <u>see</u> <u>In re Dannenberg</u>, 34 Cal.4th 1061, 1080, 1084,

23 1085, 1086 (2005) ("the overriding statutory concern" is for public safety; purpose of the statutes

24 is to "guarantee that the Board has fully addressed the public safety implications" of the release

25 determination).  This in turn requires an assessment of the inmate's current dangerousness.  <u>In re</u>

26 <u>Lawrence</u>, 44 Cal.4th 1181, 1205 (2008).  This assessment requires more than "rote recitation of

1  the relevant factors with no reasoning establishing a rational nexus between those factors and the

2  necessary basis for the ultimate decision – the determination of current dangerousness." Id. at

3  1210.  The California Supreme Court has explained:

4
> [E]vidence in the record corresponding to both suitability and
> unsuitability factors–including the facts of the commitment
5
> offense, the specific efforts of the inmate toward rehabilitation,
> and, importantly, the inmate's attitude concerning his or her
6
> commission of the crime, as well as the psychological assessments
> contained in the record–must, by statute, be considered and relied
7
> upon by both the Board and the Governor, whose decisions must
> be supported by some evidence, not merely a hunch or intuition.
8

9  Id. at 1213 (emphasis in original).  It continued:

10
11
> [A]lthough the Board and the Governor may rely upon the
> aggravated circumstances of the commitment offense as a basis for
> a decision denying parole, the aggravated nature of the crime does
12
> not in and of itself provide some evidence of current dangerousness
> to the public unless the record also establishes that something in
13
> the prisoner's pre- or post- incarceration history, or his or her
> current demeanor and mental state, indicates that the implications
14
> regarding the prisoner's dangerousness that derive from his or her
> commission of the commitment offense remain probative to the
15
> statutory determination of a continuing threat to public safety.

16  Id. at 1214 (emphasis in original).

17        The regulations governing parole dates are found in title 15 of the

18  California Code of Regulations.  Section 2401 of this title provides in relevant part:

19
> In setting the parole date the panel shall consider the Sentencing
> Rules for the Superior Courts. The panel shall also consider the
20
> criteria and guidelines set forth in this article for determining the
> suitability for parole and the setting of parole dates, considering the
21
> number of victims of the crime for which the prisoner was
> sentenced and any other circumstances in mitigation or
22
> aggravation.

23
> The terms in this article are guidelines only. The suggested terms
> serve as the starting point for the board's consideration of each case
24
> on an individual basis.

25  15 Cal. Code Regs. § 2401.

26  /////

8

Section 2402 provides in part:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

The regulations then address the circumstances that show suitability and unsuitability for parole, noting that the "circumstances are . . . general guidelines; the importance attached to any circumstance or combination of circumstances . . . is left to the judgment of the panel." 15 Cal. Code Regs. § 2042(c). Those things that suggest unsuitability include the heinous, atrocious or cruel nature of the commitment offense, which may be shown by the number of victims injured, attacked or killed, the dispassionate or calculated manner of its commission, abuse or mutilation inflicted on the victim, or indications that the crime was committed with "an exceptionally callous disregard for human suffering" or for a trivial motive. 15 Cal. Code Regs. § 2402(c)(1)(A)-(E). Other factors include an inmate's previous record of violence, history of "unstable or tumultuous relationships," a record of sadistic sexual offenses, a lengthy history of "severe mental problems related to the offense," and serious misconduct in prison. 15 Cal. Code Regs. § 2402(c)(2)-(6).

As with the unsuitability factors, those suggesting a prisoner's readiness for parole are "general guidelines," with the weight to be given to any of them left to the discretion of the

9

1  panel.  They are the lack of a juvenile record; a history of "reasonably stable relationships"; acts

2  demonstrating remorse, which include acts indicating the presence of remorse, such as

3  attempting to repair the damage, seeking help for or relieving suffering of the victim, or

4  indicating that he understands the nature and magnitude of the offense; the crime was the result

5  of significant, long term stress; no significant history of violence; age which reduces the

6  likelihood of recidivism; realistic parole plans or the development of marketable skills; and in-

7  prison behavior suggesting an "enhanced ability to function within the law."  15 Cal. Code Regs.

8  § 2402(d)(1)-(9).

9       In this case, the Superior Court identified three factors as comprising the requisite

10  "some evidence" to support the denial of parole: the nature of the offense, the lack of

11  documentary support for petitioner's parole plans and community support, and the parole board's

12  assessment of petitioner's adjustment.  Answer, Ex. 15.

13       As both Lawrence and Hayward observed, the circumstances of the crime by

14  themselves are not probative of current dangerousness in the absence of other factors.  The

15  Superior Court did rely on this factor, but not exclusively, to find that the denial was proper.  The

16  question then becomes whether it was proper for the court to cite petitioner's unverified parole

17  plans and his adjustment as factors supporting the denial and demonstrating that the implications

18  from the commission of the murder continue to be probative of current dangerousness.

19       A. Petitioner's Adjustment

20       Although the Superior Court did not define what it meant by petitioner's

21  "adjustment," the panel did discuss several things that fall under adjustment.  It noted that

22  petitioner had programmed in a limited manner, that he appeared to lack remorse or regret for the

23  murder, and he "demonstrated an argumentative posture about providing documents" and

24  showed a "willingness to argue about the value of documented . . . confirmation of the parole

25  plans. . ."  Answer, Ex. 2 at 46-47.

26  /////

1. Lack Of Remorse

The panel described the commitment offense:

> The subject took out a 50,000 dollar life insurance policy on himself and his wife–and the victim, his wife, Flora.  On December 12, 1981 . . ., during a heated domestic dispute, subject strangled his wife . . . . He then bound her hands in back of her with an electrical appliance cord and tied a block of concrete to her.  He then placed her into a rented truck and dumped her body into the San Francisco Bay near the San Mateo Bridge.  On December 15th of 1981, subject reported his wife missing to Oakland Police Department.  On December 28th of 1981, the victim's body washed up in a marsh . . . .  Police questioned Benson extensively, but Benson denied any knowledge of the victim's death. . . . The check Benson used to pay the first insurance payment subsequently bounced, and he was notified of this fact on . . . the day police discovered the victim's body.

Id., Ex. 2 at 9-10.  Petitioner agreed that this was "essentially what happened," but then said the insurance policy was void from the beginning because the victim had not listed her epilepsy and so "the insurance policy would be invalid anyway.  It wouldn't have mattered."  He claimed he was aware of this because he looked at the application before he turned it in and that he was aware the check had bounced on December 8th or 9th.  Id., Ex. 2 at 10-11.  He also explained that the victim was not taking her medication for psychomotor epilepsy, which made her go "a little bit insane."  Id., Ex. 2 at 13.  He said the argument was the "culmination of a rocky relationship," plagued by domestic problems and "mutual combat."  Id., Ex. 2 at 12.  He acknowledged there is "no moral justification for taking of a life . . . ," and even though he was under the influence of marijuana and alcohol at the time of the crime, he did not claim his substance abuse was the cause of what happened.  Id., Ex. 2 at 14, 19.

The psychosocial assessment characterized petitioner's feelings of remorse as "sincere and genuine" and quoted another psychological report that reached the same conclusion.  Id., Ex. 8 at 3, 4, 6.

In In re Shaputis, 44 Cal.4th 1241, 1260 (2008), the California Supreme Court found that an inmate's lack of insight into the factors leading to the crime could meet the "some

evidence" standard for a finding of dangerousness; in that case, the inmate insisted that the shooting of his wife was an accident even though there was a documented history of domestic abuse.  The court recognized there was "no special formula" that would show an inmate had "gained insight into, and formed a commitment to ending, a previous pattern of violence."  Id. at 1260 n.18.  In the wake of Shaputis, at least one California Court of Appeal has held that an inmate's continued reliance on his own version of events does not necessarily show current dangerousness when that version "was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational."  In re Palermo, 171 Cal.App.4th 1096, 1112 (2009).  In this case, the only dispute petitioner had with the account of the crime was that it was undertaken for financial gain, a claim that does not necessarily "strain credulity."  He did not deny that he had strangled the victim in a rage and then attempted to hide his action, and he eschewed any reliance on his use of drugs and alcohol to excuse his behavior, despite his attempts at earlier hearings to mitigate his behavior by noting his drug abuse.  See Answer, Ex. 11 at 3.  Petitioner's purported lack of remorse is not supported by this record.

2.  Argumentativeness

Commissioner Daly pointed out there were no letters from petitioner's family affirming they would provide for him for up to six months to allow him to get on his feet; petitioner said there were earlier letters of support in his file.  Id., Ex. 3 at 31.  Daly continued that petitioner might well have family support from his ex-wife and son and from his brothers, but the panel could not "take that for granted" and there was nothing before the panel confirming these claims.  Id., Ex. 2 at 31.  He said it would be helpful if petitioner had written confirmation from the union, confirming he is a member in good standing.  Id., Ex. 2 at 35.  When asked, petitioner conceded he could "see the value of having a letter on file from the Union," but argued that the regulation said he needed only a realistic plan for the future, which he outlined in his testimony.  Id., Ex. 2 at 38-39.  Daly said petitioner's application for parole would be

1    strengthened if he went beyond the minimum established by the regulations and had a letter from

2    the Buddhist Peace Fellowship, to which petitioner said he belonged.  Id., Ex. 2 at 39.  Petitioner

3    said, "I've had nine, eight letters sent by my family, and every time I do that, that puts them

4    through an emotional roller coaster.  And I'm trying to save my family from all that as much as I

5    can . . . ."  Id., Ex. 2 at 40.

6            At the conclusion of the hearing, one of the panel members said that when his

7    advice to petitioner about enhancing his application for parole was met with argument, he

8    wondered how petitioner would be able to deal with authority and frustration.  Id., Ex. 2 at 50:13-

9    18; 51:2-4.  Petitioner immediately countered that he had been disciplinary free for eleven years.

10   Id., Ex. 2 at 51:5-7.

11           As the Lawrence court observed, an inmate's demeanor may provide evidentiary

12   support for a denial of parole.  Lawrence, 44 Cal.4th at 1214.  In Collier v. Ayers, 2010 WL

13   702250 (N.D. Cal. 2010), the court found the panel properly relied on the inmate's "negative

14   attitude" and hostility during the hearing along with his failure to pursue self-help and therapy to

15   gain insight into the crime as some evidence of current dangerousness.  While reliance on this

16   factor alone may not have been sufficient, it was one factor the panel and the state court could

17   consider.

18           3.  Limited Programming

19            Although the court has found no precise definition of "programming" as it is used

20   in the parole context, it seems to be a blanket term for institutional activities that "demonstrate an

21   enhanced ability to function within the law upon release."  15 Cal. Code Regs. § 2402(d)(9); see

22   Saldate v. Adams, 573 F.Supp.2d 1303 (E.D. Cal. 2008) (inmate had taken anger management

23   classes in addition to AA membership).[3]

24

25       [3]  The panel did not question petitioner's decision not to upgrade vocationally in light of
     his pre-incarceration work as a machinist and his eleven years of tool and die experience in the
26   institution.  Answer, Ex. 2 at 22-24, 29; see Mauzey v. Kane, 2007 WL 1232059, at *10 (N.D.

1    The record shows petitioner's long-standing involvement with Alcoholics

2  Anonymous (AA),which included three years as the secretary and his volunteering as a literacy

3  tutor.   Answer, Ex. 2 at 20-21, 28-29.  But there was no suggestion that petitioner had attended

4  any anger management classes or self-help programs.

5    Petitioner told the panel he was a member of the Buddhist Peace Fellowship from

6  Berkeley, that he was in contact with a Buddhist priest, and that he was a lay Buddhist teacher.

7  Id., Ex. 2 at 14-15.  He was also enrolled in a religious correspondence course from the College

8  of Tao in Taos, New Mexico.  Id., Ex. 2 at 25.  There was nothing, however, showing what his

9  teaching activities entailed or what he had learned from his Buddhist studies that supported his

10  request for parole.

11    In light of the fact that the murder was the result of petitioner's angry response to

12  his wife's irrationality, the panel's concern about petitioner's programming and the Superior

13  Court's reliance on this fact was not arbitrary.  Paddock v. Mendoza-Powers, 674 F.Supp.2d

14  1123, 1133 (C.D. Cal. 2009) (inmate's failure to enroll in anger management supported denial of

15  parole in light of impetus for murder).

16    B.  Parole Plans

17    Petitioner told the panel he planned to live in Alameda County when paroled, that

18  the papers have many ads for machinists and tool and die workers, that his brothers have agreed

19  to provide for an apartment, a car, a toolbox and enough money to live on for six months.

20  Answer, Ex. 2 at 30.  He said he was a union machinist and would be able to get a job through

21  the machinists' or steelworkers' union, but he was willing to work any job.  Id., Ex. 2 at 32, 33.

22  He said he would attend meetings of the Peace Fellowship where he has been a member since

23  1994.  Id., Ex. 2 at 34.  As the panel observed, however, there were no current letters in the file

24  confirming his family's promise of support, no current union card or other evidence showing that

25

26  Cal. 2007) (no need to show updated vocation when inmate already had job skills).

1 the union was a viable source of employment, and nothing suggesting what the Peace Fellowship

2 meetings would provide in terms of parole stability.

3        Although the regulation provides that the existence of solid parole plans is a factor

4 suggesting suitability for parole, the panel may consider their absence as undercutting an

5 inmate's bid for parole.  15 Cal. Code Regs. § 2402(d)(8); In re Cerny, 178 Cal.App.4th 1303,

6 1314 (2010).  Several courts have found that uncertain parole plans may be a factor supporting

7 denial because of the panel's concern that an inmate's rootlessness may suggest a return to

8 criminality.  Ramirez-Salgado v. Scribner, 2010 WL 1911376, at *10 (S.D. Cal. 2010); Jones v.

9 Mendoza-Powers, 2008 WL 4506763, at *10 (E.D. Cal. 2008).

10        Given that the factors relied on by the Superior Court were supported by the

11 record, this court does not find that court's ruling was arbitrary; it does not represent an

12 unreasonable application of federal law.

13        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

14 writ of habeas corpus be denied.

15        These findings and recommendations are submitted to the United States District

16 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

17 one days after being served with these findings and recommendations, any party may file written

18 objections with the court and serve a copy on all parties.  Such a document should be captioned

19 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20 shall be served and filed within fourteen days after service of the objections.  The parties are

21 advised that failure to file objections within the specified time may waive the right to appeal the

22 District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

23 DATED:  September 30, 2010.

24

25 _____

   U.S. MAGISTRATE JUDGE

26 2 bens2202.submhc

15